**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

LONG OIL HEAT, INC. d/b/a LONG ENERGY,

                         Plaintiff,                1:16-cv-00899 (BKS/DJS)

v.

WILLIAM SPENCER, THOMAS SPENCER, NORTH
EAST FREIGHTWAYS, INC., and PHILLIP J. PALKER

                         Defendants.

---

**Appearances:**

*For Plaintiff:*

Robert E. Ganz
Lippes Mathias Wexler Friedman LLP
One Columbia Circle
Albany, NY 12203

*For Defendants Northeast Freightways, Inc. and Phillip J. Palker:*

Joseph J. Manna
Lipsitz Green Scime Cambria, LLP
42 Delaware Avenue, Suite 120
Buffalo, NY 14202

Michael J. Lambert
Michael R. Stanley
Sheehan Phinney Bass & Green
255 State Street
Boston, MA 02109

*For Defendants William and Thomas Spencer:*

Daniel J. Martin
Robert F. O'Neill
Celeste E. Laramie
Gravel & Shea PC
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, VT 05402

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Long Oil Heat, Inc., doing business as Long Energy ("Long Oil"), brings this diversity action against Defendants William Spencer ("William"), Thomas Spencer ("Thomas," together with William, the "Spencers" or the "Spencer Defendants"), North East Freightways, Inc. ("NEF"), and Phillip J. Palker to recover unpaid balances for fuel oil services Long Oil provided to Land-Air Express of New England, Ltd. ("LAE") until May 2016. (Dkt. No. 2). Although the Complaint also named LAE as a defendant, (*id.*), LAE stipulated to entry of judgment, (Dkt. No. 50), and partial judgment was entered against it in the amount of $204,733.58 on December 7, 2018, (Dkt. No. 51). Plaintiff's claims against the remaining Defendants include claims for: (1) breach of contract against NEF (third cause of action), (Dkt. No. 2, ¶¶ 29–33, 62); (2) personal guaranty against Palker (fourth cause of action), (*id.* ¶¶ 34–36, 62); (3) account stated against NEF and Palker (fifth cause of action), (*id.* ¶¶ 37–38, 62); (4) improper dissolution against William and Thomas Spencer (sixth cause of action), (*id.* ¶¶ 39–43, 62); (5) fraudulent conveyance against all Defendants (seventh cause of action), (*id.* ¶¶ 44–51, 62); and (6) unjust enrichment against NEF and Palker (eighth cause of action), (*id.* ¶¶ 52–62).[1] Plaintiff has moved for summary judgment on all its claims against the remaining Defendants, (Dkt. No. 64); the motion is opposed by Defendant NEF,[2] (Dkt. No. 73), and the Spencer Defendants, (Dkt. No. 75-1). Defendants NEF and Palker have cross-moved for

---

[1] Plaintiff acknowledges that its claims for breach of contract (first cause of action) and account stated (second cause of action) against LAE have been resolved by the December 7, 2017 partial judgment and that none of the remaining claims are against LAE. (*See* Dkt. No. 64-19).

[2] Although this opposition appears to be on behalf of NEF alone, the Court understands the cross-motion filed by NEF and Palker to necessarily imply that Palker also opposes summary judgment for Plaintiff. (*See* Dkt. No. 67).

summary judgment against Plaintiff on all claims, (Dkt. No. 67); Plaintiff opposes the cross-motion, (Dkt. No. 70). For the reasons set forth below, Plaintiff's motion is granted in part and denied in part, and Defendants NEF and Palker's cross-motion is denied in its entirety.

## II.    FACTS[3]

### A.    LAE's Business and Commercial Relationship with Long Oil

Plaintiff Long Oil is a New York corporation based in Albany County, New York, that provides fuel oil and other petroleum products to residential and commercial customers. (Dkt. No. 64-20, ¶ 1; Dkt. No. 67-3, ¶ 12). From 2012 to 2016, Long Oil provided LAE, a transportation company, with fuel for its trucks at LAE's Capital Region facility in Colonie, New York. (Dkt. No. 64-20, ¶ 2; Dkt. No. 67-3, ¶ 13). The fuel was stored until needed in a 3000-gallon fuel oil tank owned by Long Oil and maintained by it under a permit from the Town of Colonie. (Dkt. No. 64-20, ¶ 3).

LAE is a Vermont corporation headquartered in Williston, Vermont, and founded in 1990 by Defendant William Spencer and his father. (*Id.* ¶ 4; Dkt. No. 67-3, ¶ 7; Dkt. No. 64-8, at 18). It operated as a regional transportation company in the "less than truckload" ("LTL") sector in New England, New York, and New Jersey. (Dkt. No. 64-20, ¶ 5; Dkt. No. 67-3, ¶ 7). The LTL sector covers shipments for more than 100 pounds but less than a trailer load, (Dkt. No. 64-8), and generally involves business-to-business transactions and some residential transportation, (*id.*; Dkt. No. 64-20, ¶ 5). LAE's real estate subsidiary, Land Air Terminals, Inc., owned four of the 13 facilities from which LAE operated—in Williston, Vermont; Windsor, Vermont; Londonderry, New Hampshire; and Pittsfield, Maine. (Dkt. No. 64-20, ¶¶ 6, 40). Defendant Thomas Spencer, William's younger brother, joined LAE in 1993. (*Id.* ¶ 7). Initially, William's

---

[3] The facts have been drawn from the parties' statements of material facts and responses thereto (Dkt. Nos. 64-20, 67-3, 71, 74, 75-2), and from the submitted exhibits and affidavits.

father owned 100% of LAE, but he eventually transferred his ownership interest to his sons, granting each of them a 50% stake. (*Id.*; Dkt. No. 67-3, ¶¶ 9–10). William became LAE's president, and Thomas held various positions in operations and sales. (Dkt. No. 64-20, ¶ 7).

### B.     LAE's Financial Difficulties

At the end of 2015, LAE was in a "[h]ighly leveraged" financial situation, having borrowed to acquire a variety of assets. (Dkt. No. 64-8, at 20). After a "thorough audit," the Federal Motor Carrier Safety Administration ("FMCSA") revoked LAE's operating authority between December 28, 2015 and January 8, 2016. (Dkt. No. 64-8, at 21; Dkt. No. 64-20, ¶ 8; Dkt. No. 67-3, ¶ 24). The shutdown caught LAE "off guard," (Dkt. No. 64-8, at 21), and caused the company further financial difficulty. (Dkt. No. 67-3, ¶ 25).

William started looking for financial assistance within the industry. (Dkt. No. 64-20, ¶ 8). He received a call from his friend Defendant Philip Palker, the founder of Defendant NEF, a New Hampshire company[4] involved in a different segment of the transportation industry in New England and surrounding regions—namely the "full truckload quantity business" (i.e., loads heavier than LTL) and "dedicated logistics" (i.e., "providing a fleet of trucks for a customer . . . [who] can then dictate what the logistics are with them") in primarily business-to-business transactions. (Dkt. No. 64-8, at 22–24; Dkt. No. 64-16, at 12; Dkt. No. 67-4). In a January 8, 2016 email to Palker, William explained that his plan was to "[c]lose out NJ operation to return to our routes in NE/NY," "[p]roduce about 50M [in] revenue," and "[f]ile for protection and move on with our business." (Dkt. No. 64-7, at 1). He added that he needed "help to get over the days . . . lost" and was "[w]illing to give equity of course." (*Id.*).

---

[4] When this action was commenced on July 21, 2016, NEF was a New Hampshire corporation based in Manchester. (*See* Dkt. No. 67-5). On June 20, 2018, NEF converted to a limited liability company. (*See id.*).

After sending that email, William continued to have conversations with Palker and other possible investors about "what any of them would be willing to do to help," and he sent Palker financial information on LAE. (Dkt. No. 64-8, at 27–28). In particular, William was looking for a loan to cover payroll. (*Id.* at 33). On approximately January 13, 2016, William met with Palker and Dick Anagnost, NEF's co-owner,[5] at Anagnost's Manchester office. (*See* Dkt. No. 64-8, at 33–34; Dkt. No. 64-16, at 21–22; Dkt. No. 64-13, at 29–31). William asked for a loan to cover payroll. (Dkt. No. 64-8, at 33). Anagnost further testified that William asked him to consider an investment in LAE. (Dkt. No. 64-13, at 38).

The meeting resulted in a January 13, 2016 agreement among Anagnost Investments, Inc., William, Thomas, and LAE, whereby Anagnost Investments agreed to provide LAE a $551,657.81 payroll loan secured by commercial mortgages on Land Air Terminals' four real properties and personally guaranteed by William and Thomas. (Dkt. No. 64-7, at 2–3; Dkt. No. 64-20, ¶ 12; Dkt. No. 67-3, ¶¶ 29–30). Additionally, the agreement provided that William and Thomas would "pledge all of their stock interest in Land-Air as collateral for the performance of the personal guaranties" and "convey sixty percent (60%) of their interest in Land-Air to Anagnost [Investments]." (Dkt. No. 64-7, at 2). The parties agreed to "restructure Land-Air such that the board of directors shall be comprised of five (5) individuals," with three individuals appointed by Anagnost Investments and two individuals appointed by William and Thomas. (*Id.*). Finally, "Dick Anagnost . . . shall be, and hereby is, appointed Treasurer of Land-Air and shall have sole and exclusive control over the financial affairs of the corporation with singular authority to execute checks and control all bank account[s] of the corporation." (*Id.*). He could

---

[5] Anagnost had originally lent funds to Palker's NEF business and then became a co-owner with a 40% stake. (Dkt. No. 64-13, at 20; Dkt. No. 64-16, at 15).

"only be removed by a unanimous vote of the board of directors." (*Id.*). According to William, however, no stock was ever conveyed to Anagnost Investments, LAE's board of directors was not restructured, Anagnost Investments did not exercise its option to purchase LAE's stock, and Anagnost never became treasurer of LAE. (Dkt. No. 64-8, at 35–36; Dkt. No. 67-2, ¶¶ 19–20).

### C.     Communications with Vendors

After the January 13 agreement, Palker and Anagnost's staff began communicating with LAE's lenders, vendors, customers; they also had extensive communications with LAE's comptroller, Melissa Adams, and other employees. (Dkt. No. 64-20, ¶ 14). In his communications with vendors, Palker distinguished between accounts payable that became due before NEF's involvement and those that arose after. (Dkt. No. 64-20, ¶ 15). Using LAE letterhead and signing as its representative, Palker sent letters to vendors stating that, on January 13, 2016, LAE had "entered into an agreement with investors to strategically realign its regional operations" and that "[p]art of the agreement is that all existing vendors must establish a new vendor account with a net 30 day repayment term." (*E.g.*, Dkt. No. 64-7, at 7). Palker further represented that "[a]ll invoices due and payable prior to January 13, 2016 will be reviewed and scheduled for repayment after a 120 day grace period from the date of this letter" and that "[p]ayment terms will be 5 years with a 3.0% interest rate starting 01 May 2016." (*Id.*).

In communications with fuel vendors, Palker characterized the financial backing of LAE as an investment. (*See* Dkt. No. 64-17, at 30, 55–58; Dkt. No. 64-7, at 22 (January 19, 2016 email from Palker to fuel vendor F.L. Roberts mentioning Anagnost Investments as an "investor"); *id.* at 43 (January 26, 2016 email from Palker to fuel provider Goetz Energy, referring to "the acquisition of 60% of [LAE's] stock by North East Freightways along with its investment team, Anagnost Investment[s]")). Similarly, an undated press release on joint LAE and NEF letterhead states that LAE's "recent alignment with . . . [NEF] and their associated

financial investors provided a strong fiscal infusion that allowed Vermont based Land Air Express to regain its dominant share of the Northeast LTL markers." (Dkt. No. 64-7, at 33; *see* Dkt. No. 64-17, at 28–30).

Palker testified that, at the time that these statements were made, he knew that NEF had not acquired 60% of LAE's stock. (Dkt. No. 64-17, at 55). But, according to his testimony, he still believed as of late March 2016 that a stock purchase arrangement was a possibility, and that the decision to proceed with an asset purchase agreement was made "[s]ometime in April." (Dkt. No. 64-18, at 10). William testified that an asset purchase, instead of a stock purchase, was "discussed from the beginning" as a possibility, "but [it was] not the first choice of route," and the decision to shift to an asset purchase was communicated to him by Palker or Anagnost in March. (Dkt. No. 64-10, at 24–25). At his deposition, however, Anagnost distinguished between loans and investments and stated that he "[n]ever" considered making an investment in LAE after the January 13 agreement. (Dkt. No. 64-13, at 36). Both Palker and Anagnost acknowledged that ultimately no investment was made in LAE. (Dkt. No. 64-15, at 51; Dkt. No. 64-16, at 49).

Palker informed William and Melissa Adams on January 25, 2016 that, starting that day, LAE "will start using NEF accounts for road calls, oils, lubes and fluids for the interim as we rebuild relationships" with vendors. (Dkt. No. 64-7, at 23). Vendor invoices sent to NEF would be emailed to LAE so that LAE could cut checks to the vendor. (*Id.*). Palker explained that this setup was necessary because vendors were "cutting off Land Air Express" and would only supply equipment or services to LAE if NEF was billed. (Dkt. No. 64-17, at 14; *see also* Dkt. No. 64-9, at 11–12, 26–27). The record contains a number of vendor invoices billed to NEF for

orders made by LAE.[6] (*See* Dkt. No. 64-7, at 9–13). William Spencer testified that, from time to time, LAE received and paid for goods and services from NEF as well.[7] (Dkt. No. 64-7, at 24–25; Dkt. No. 64-9, at 27–28).

On February 4, 2016, Joseph Bosley, a senior accountant at LAE who was administering payroll, emailed William that Palker "has been making promises to pay on some of these vendors which our cash flow will not be able to sustain and may cause larger issues in the near future," adding, "I think we may need to discuss our script and plan of attack on some of these accounts." (Dkt. No. 64-7, at 21; *see* Dkt. No. 64-9, at 66). Palker responded, "Which specific customer are you referring to? I'm sure I have sound reasons for each one." (*Id.* at 20). Bosley replied, "I do not deny that, I just know we will not have the cash to make the payment." (*Id.*). At his deposition, William stated that Long Oil was on a "very long list" of vendors to which he, Palker, and "a lot of people" at LAE made payment promises that "cash flow would not support."[8] (Dkt. No. 64-9, at 17–18).

Palker testified that Melissa Adams sent him a schedule of accounts payable in early February 2016. Asked why LAE employees provided him that information, Palker said that "they were trying to keep the company alive through the due diligence period," and he "needed to find out if we were going to—if Land Air was going to go out of business." (Dkt. No. 64-16, at 47). Discussing what he meant in the previously described press release by a "recent

---

[6] Anagnost testified that he "put a stop" to the mailing of LAE invoices to his office and LAE's use of NEF credit once he learned about those practices. (Dkt. No. 64-14, at 1–4).

[7] Anagnost testified that he did not "have a clue" whether NEF "got preferential treatment of getting this paid over other vendors," but he "assum[ed] that the answer would be yes because [Palker] would have got his head cut off" if NEF did not get paid. (Dkt. No. 64-14, at 22).

[8] William then stated that "we all had high hopes that we would be able to fund any promises that were made by anyone to all of our vendors and eventually pay them all within the margins of profit and cash flow that were hoping to enjoy." (Dkt. No. 64-9, at 17–18).

alignment" between LAE and NEF, (Dkt. No. 64-7), Palker explained that "we were trying to keep the company afloat until we could figure out if the company was able to float on its own, and we wanted to make sure that we maintained a solid customer base." (Dkt. No. 64-17, at 29). He was "[t]rying to make it colorful so people"—not only customers but also vendors—"would stay on board with us." (*Id.*).

### D. Palker's Operational Role at LAE in Early 2016

Several email chains in early 2016 show that Palker was involved in LAE operations. In a January 14, 2016 email, Palker told a LAE employee that "[p]rior to ordering maintenance parts at ALL locations please put an email request through me." (Dkt. No. 64-7, at 18). About this email, Palker testified: "I didn't tell him yes or no to order them. We just needed to understand where money was being spent so we could keep the company afloat. . . . [I]f Bill objected, we would have time to tell him not to order it." (Dkt. No. 64-16, at 57). The following day, Palker wrote an email to Melissa Adams, copying his accountant Edward Baroody, William, and Anagnost, directing her to pay certain accounts. (Dkt. No. 64-7, at 14). According to his testimony, Palker was not authorized to direct Melissa Adams regarding which bills to pay, and he was only "assisting Bill Spencer, as his friend, from time to time." (Dkt. No. 64-16, at 54). On January 26, 2016, after Melissa Adams asked whether she could pay pension and health insurance contributions, Palker instructed her to "[p]ay fidelity and Let s [sic] hold off on these other payments." (Dkt. No. 64-7, at 15–17). At his deposition, Palker characterized these instructions as his "recommendation" as a friend of William. (Dkt. No. 64-16, at 55–56).

Anagnost testified that Palker, when "dealing with Land Air Express," was acting on behalf of NEF only in "some capacities." (Dkt. No. 64-14, at 35). And when not acting on behalf of NEF, Palker was acting in "[h]is own [capacity] in helping out his friend Bill Spencer." (*Id.* at 35–36). Anagnost further elaborated:

Q: It's your testimony that to the extent it wasn't something that you directed him to do, anything that Mr. Palker did, he was doing in his individual capacity?

A: Absolutely.

Q: Even if he was utilizing Northeast Freightways' resources, computers, and so forth and so on to do that, correct?

. . . .

A: Yes, correct. He acted in a consulting capacity or a friendship capacity or whatever he was up there doing, but he wasn't conducting Freightways' business when he was there a good portion of the time.

(*Id.* at 36). According to Palker's testimony, neither Anagnost nor William ever told him to stop using his NEF email when communicating to third parties about LAE matters. (Dkt. No. 64-17, at 26).

An employee handbook last updated on April 30, 2016 bears the logos of LAE and NEF and lists William and Palker as co-presidents of "North East Freightways/Land Air Express." (Dkt. No. 64-7, at 47–49). Palker testified that he created the document and "suspect[ed] this was put on the cover of the handbooks" but did not know when. (Dkt. No. 64-18, at 14). Similarly, an undated employment application bears both companies' logos and provides a joint address for "North East Freightways, Inc & Land Air Express." (Dkt. No. 64-7, at 50). Palker stated that this form was used but did not know when. (Dkt. No. 64-18, at 14–15). Another document relating to the "Health & Safety Program" of "North East Freightways/Land Air Express" bears the two companies' logos; Palker is mentioned as "President North East Freightways/Land Air Express, Inc."[9] (*Id.* at 51–53). William testified that "all of these documents were conjured up about the same time" and were "probably" timed to go into effect upon consummation of the asset

---

[9] The document appears to be dated January 2, 2010, (*see* Dkt. No. 64-7, at 53), but Palker explained at his deposition that the date was a holdover from a previous version of a NEF document, (Dkt. No. 64-18, at 16).

purchase, but he found no records indicating that the above documents were ever actually used. (Dkt. No. 64-10, at 20–22).

### E. Representations to Long Oil

In his affidavit, Long Oil's president, Robert Long, Sr., asserts that he learned of LAE's shutdown "at the very beginning of January" 2016, and William called in mid-January to tell Long that "a friend, Phillip Palker, and his company, [NEF], was going to be investing in Land Air Express." (Dkt. No. 64-1, ¶¶ 8–9). According to Long, William assured him that Long Oil "would get paid for not only current deliveries, but also the past due, if [Long Oil] would just 'hang in there' and continue to provide them with their fuel needs for the Colonie terminal on an open account basis." (*Id.* ¶ 9). Long was "skeptical" and asked to speak to Palker. (*Id.* ¶ 10). Palker contacted Long and "described [NEF] as an 'investor' in Land Air Express, indicated that they either had or were in the process of buying 60% of the stock of Land Air Express along with their banker, Anagnost Investment Company and had already made a 'fiscal infusion.'" (*Id.* ¶ 11).

Additionally, Long states that he "received a letter from Mr. Palker concerning setting up a new account number for current deliveries with a promise of preferential repayment treatment on the past due balance." (*Id.*). At his deposition, Palker described his conversation with Long as follows:

> There were conversations about two different debts. One of the debts being an old debt of Land Air Express of New England, and the other one about what Long Oil could do for Land Air Express moving forward.
>
> So these conversations were, one, to try to get an understanding of what Land Air Express of New England's capability would be to purchase fuel moving forward, and the other one was a conversation that we would have to have at some point regarding the past dues, because Bob [Long] wanted to make sure that those old past dues were a part of moving forward.

(Dkt. No. 64-17, at 35–36).

Long asserts that, when he spoke to Palker in mid-January 2016, he "pressed [Palker] for payment on past due balance under account #8077 and indicated initially that [he] would only provide current deliveries on a [cash-on-delivery] basis given the past due situation." (Dkt. No. 64-1, ¶ 12). According to Long,

> Palker then indicated that North East Freightways also operated in [Long Oil's] region and he could promise more business, not only in the form of continued purchases by Land Air Express as it moved forward under new ownership, but also from North East Freightways. Further, he stated that we could rely on North East Freightways to insure Land Air's past due balance would be paid and he would sign a personal guarantee for the new purchases. He told me that bills should be sent to Anagnost's office for processing and that payments for such new purchases would be maintained on a "current" basis. This made me feel there was now real financial strength behind Land Air.

(*Id.* ¶ 13).[10]

By the end of 2015, LAE owed Long Oil $147,000 under the existing account (#8077). (Dkt. No. 67-3, ¶¶ 13, 15). Long asserts that, based on Palker's representations, Long Oil opened a second account (#101788) for sales of fuel to LAE after January 13, 2016. (Dkt. No. 64-1, ¶ 14). On January 22, 2016, Palker applied to Long Oil for credit; he signed the credit application form on behalf of LAE and listed Anagnost as the company's owner. (Dkt. No. 64-17, at 41–44; Dkt. No. 64-7, at 136–37). Above Palker's signature, a statement read, "In signing this document, I personally guarantee payment on the above account." (Dkt. No. 64-7, at 137). Long Oil then received a payment on the past due account and a payment for a current delivery. (Dkt. No. 64-1, ¶ 15; Dkt. No. 64-7, at 34–37; Dkt. No. 64-17, at 39–40; Dkt. No. 64-9, at 45–47).

---

[10] At his deposition, Palker did not recall promising to pay Long Oil for past due bills. (Dkt. No. 64-17, at 38–39). But he testified that Long was initially willing to supply fuel on a cash-on-delivery basis only and later agreed to supply on an open-account basis. (*Id.* at 37). Palker did not recall if he made promises to change Long's mind. (*Id.* at 38).

Long asserts that Long Oil "continued to deliver fuel oil on credit through May 13, 2016" but "received no further payments." (Dkt. No. 64-1, ¶ 15).

Palker testified that he told Long about his intention that LAE continue to purchase fuel from Long Oil. (*Id.* at 45). Nevertheless, he acknowledged that he "was setting up backups for everywhere" and authorized Steve Valle, LAE's Albany terminal manager, to apply to the Town of Colonie to replace Long Oil's fuel tank with one provided by Dennis K. Burke. (*Id.* at 47–49; Dkt. No. 64-7, at 120–33). Palker conceded that he was "going through the permitting process to replace [Long] with Mr. Burke" even while "obtaining fuel on credit from Mr. Long." (Dkt. No. 64-17, at 50–51).

### F.    Transfer of LAE's Personal Property

As William testified, Palker or Anagnost informed him at the end of March 2016 that NEF was considering acquiring assets of LAE in exchange for assuming its secured debt. (Dkt. No. 64-10, at 25; Dkt. No. 67-3, at 6). As described by William, through this transaction, LAE would "lose all the assets for the value of the debt."[11] (Dkt. No. 64-10, at 27).

LAE and NEF entered into an asset purchase agreement that is dated April 2016.[12] (Dkt. No. 64-7, at 54). It provided for the transfer to NEF of LAE's equipment, intellectual property, customer list, accounts receivable, cash, telephone numbers, and books and records related to operations; but it excluded certain assets, such as LAE's contract rights, tax records and refunds,

---

[11] Although Anagnost asserted that he and William negotiated the transaction, (Dkt. No. 64-15, at 15), William testified that he "had no choice" because the "alternative was the end of [his] life's work and the unemployment of all the people [William] worked with [his] entire life," (Dkt. No. 64-10, at 25–26). Referring to the asset purchase agreement, William testified: "I was asked to sign it. But nothing was negotiated." (Dkt. No. 64-10, at 27).

[12] Asked when the agreement was signed, William testified that "the process was delayed." (Dkt. No. 64-10, at 24). In his affidavit in support of Defendants NEF and Palker's cross-motion for summary judgment, William asserted that the acquisition occurred "on or around May 8, 2016." (Dkt. No. 67-2, ¶ 17). Palker also testified it was "[o]n or about" May 8, 2016. (Dkt. No. 64-18, at 28–29).

and insurance policies.[13] (*See* Dkt. No. 64-7, at 56). In connection with the asset transfer, NEF "assume[d] and agree[d] to pay, perform and discharge all" of the encumbrances (defined as the "mortgages, pledges, liens, claims, security interests, conditional sales agreements, leases or other encumbrances or changes of any kind, nature or description") on the assets listed in a schedule attached to the agreement. (*Id.* at 54–57; *see* Dkt. No. 67-12, at 2–4). NEF, however, did not assume any other liabilities, (*id.* at 57), and William understood that NEF did not assume trade debt, (Dkt. No. 64-10, at 31). Additionally, one of the terms of the agreement was that William would be given "[a]n offer of employment . . . on terms and conditions mutually acceptable to [NEF] and Mr. Spencer." (Dkt. No. 64-7, at 63). William and Thomas signed one-year consulting agreements with LAX, LLC—a company formed to operate the business formerly carried on by LAE after the asset purchase—providing each of them with compensation of $218,400 per year; that consulting arrangement has continued past the one-year term. (*See* Dkt. No. 64-7, at 69–74; Dkt. No. 64-10, at 33–35; Dkt. No. 64-18, at 11, 33).

William personally guaranteed some or all the secured debt assumed by NEF, and he testified that his "personal guarantees would remain" after the transaction. (Dkt. No. 64-10, at 32, 35–36). He conceded, nevertheless, that payment on those debts would reduce his exposure under the personal guaranties. (*See* Dkt. No. 64-9, at 33–34). At his deposition, Anagnost agreed that a reduction of the loan balance would reduce William's exposure on the personal guaranties, but he noted that he "required [the personal guaranties] to stay in place" and that "there would be no release of any personal guarantees as a result of the assignment or assumption." (Dkt. No. 64-

---

[13] In his testimony, Palker agreed that the transferred assets had value and that LAE had goodwill; further, he acknowledged that it was critical in the decision to proceed with the asset purchase that LAE be an ongoing operation with goodwill. (Dkt. No. 64-18, at 35).

14, at 26–27). Palker testified that, since May 2016, LAX or NEF had been paying down debt principal at a level of about $200,000 per month. (Dkt. No. 64-18, at 47–48).

According to his affidavit, Long learned that "the May 2016 transaction between Land Air and [NEF] was not a stock sale" but an asset sale "after it was complete and the new operation was ready to switch vendors." (Dkt. No. 64-1, ¶ 18). He only obtained that information when he "pressed Mr. Palker for further payments" on the outstanding accounts. (*Id.*).

### G.    Transfer of LAE's Real Property

Anagnost Investments' January 13, 2016 loan of approximately $550,000 to LAE to cover payroll was memorialized in a promissory note, (*see* Dkt. No. 64-7, at 78–79), and secured by commercial mortgages on Land Air Terminals' four real properties, (*see id.* at 94–117).[14] Based on the Spencers' representations, Anagnost believed that the mortgages granted were second in priority to secured bank lenders. (Dkt. No. 64-14, at 9–10). At the time, Anagnost was not aware of a mortgage purportedly granted to MidCap Business Credit LLC ("MidCap"), the primary working-capital lender for LAE.[15] (Dkt. No. 64-13, at 47; Dkt. No. 64-14, at 10–11).

At his deposition, Anagnost was presented with a chart listing the four facilities previously owned by Land Air Terminals.[16] (*See* Dkt. No. 64-15, at 1–3; Dkt. No. 64-7, at 46).

---

[14] The Court notes, however, that the mortgage on the property in Pittsfield, Maine, was granted by LAE, not Land Air Terminals. (*See* Dkt. No. 64-7, at 99).

[15] While it is undisputed that LAE entered into a loan and security agreement with MidCap in January 2015, which provided a $7.5 million revolving credit line secured by "all assets" of LAE, (Dkt. No. 67-3, ¶ 17; Dkt. No. 67-11), Plaintiff denies, based on its counsel's title searches, that MidCap had a perfected security interest in LAE's real property as of January 1, 2016, (Dkt. No. 69, at 2–3). Anagnost testified that he came to understand during due diligence that MidCap had a second mortgage on LAE's real estate assets. (*See* Dkt. No. 64-13, at 44–47; Dkt. No. 64-14, at 10–11, Dkt. No. 64-15, at 22). Palker, on the other hand, testified that "MidCap didn't carry any mortgages." (Dkt. No. 64-17, at 62).

[16] Plaintiff's counsel represented to Anagnost that "in prior depositions this was identified as a chart that Melissa Adams at Land Air made and sent forward to Mr. Palker." (Dkt. No. 64-15, at 1). Counsel, however, has not proffered any deposition testimony confirming that the chart was provided during due diligence. Neither Anagnost nor Palker specifically recalled receiving such a chart, although Anagnost stated he had seen "[s]omething similar" before discovery in the case. (*Id.* at 2; Dkt. No. 64-17, at 60). William merely acknowledged that the chart showed the "Spencer-owned real property that was being utilized for the Land Air Operation." (Dkt. No. 64-10, at 13).

Anagnost testified that, based on representations made by the Spencers during due diligence, he believed that there was equity in the four properties. (Dkt. No. 64-15, at 2–3). He did not recall how much equity there was, but he acknowledged that, excluding the MidCap loan and based on the difference between the fair market value and the loan balances on the four properties listed in the chart, the combined equity value was approximately $1.1 million. (*Id.* at 3–4). Asked whether that figure corresponded with "what [he] believed based on the representations the Spencers made to [him]," Anagnost responded that it was "a reasonable assumption." (*Id.*).

Anagnost testified that he acquired "all of the mortgage debt on [LAE's] real estate" assets in April 2016, a few weeks before the asset purchase agreement. (*Id.* at 19–20). He estimated paying "in excess of $6 million" to acquire the debt owed to the two first mortgage holders—BDC of New England and Merchants Bank—and MidCap, including interest, fees, and penalties, (*id.* at 20–21), although he then clarified that he paid about $5.6 million in cash to BDC of New England and MidCap and assumed the $400,000 Merchants Bank loan, (*id.* at 22–24). At the time, the first mortgage holders' loans were in default, (*id.* at 20), and LAE had failed to make monthly payments on Anagnost Investments' payroll loan. (Dkt. No. 64-13, at 34–35; Dkt. No. 64-15, at 6–8). As part of the acquisition, Anagnost testified that all the mortgages, including the Anagnost Investment mortgages, were assigned to his separate company Santorini Real Estate Holdings, LLC ("Santorini"). (Dkt. No. 64-13, at 14; Dkt. No. 64-15, at 22). However, according to title searches conducted by Plaintiff's counsel in Vermont, New Hampshire, and Maine, there is no record of an assignment of Anagnost mortgages to Santorini. (Dkt. No. 69, at 3–4; *see also* Dkt. Nos. 69-1 to -3).

Having acquired the real estate debt, Anagnost "explained to [William] that there were two choices." (*Id.* at 41). "He could go through foreclosure, because we had accelerated the debt

as BDC had already accelerated, or we could enter into a deed in lieu of foreclosure and avoid all of that." (*Id.*). Land Air Terminals ultimately opted for warranty deeds in lieu of foreclosure transferring the Londonderry property and the Williston property to Santorini.[17] (Dkt. No. 64-7, at 118–19; Dkt. No. 69-1, at 35–39; Dkt. No. 69-2, at 80–81). Asked whether this process was used for the other properties, Anagnost assumed that if his attorney "did it for one he did it for all." (Dkt. No. 64-15, at 44).

### H.    Current Operation

The new entity, LAX, is owned by Anagnost, Palker and his wife, and their accountant Baroody. (Dkt. No. 64-18, at 38). Palker is the president of LAX (doing business as Land Air Express) and manages the business with William and Thomas, who serve as consultants overseeing operations and administration, respectively. (*Id.* at 41–42). According to Palker's testimony, LAX operates in the same locations as LAE did in May 2016 (except that its Syracuse facility moved to a different location in that city), and it continues to use the same corporate phone number and customer list. (*Id.* at 43–45). The trailers and power equipment transferred to NEF were not retitled. (Dkt. No. 64-10, at 36; Dkt. No. 64-18, at 29–31). At their deposition, neither William nor Palker knew whether LAX or NEF had filed for authority to do business in New York. (Dkt. No. 64-10, at 38; Dkt. No. 64-18, at 37). Long asserts that, "based on [his] personal observation in the Capital Region, the business is still being operated as Land Air Express of New England and utilizing the same goodwill which was engendered prior to the asset sale of May 2016." (Dkt. No. 64-1, ¶ 23; *see also id.* at 11–16 (photos of signage and trucks using the old name)).

---

[17] Plaintiff's counsel submitted an affidavit asserting that court searches show no foreclosure proceedings commenced on the Anagnost Investment mortgages for the Vermont and New Hampshire properties. (Dkt. No. 69, at 4).

## I.       Judgment and Outstanding Debt

Long Oil has received a judgment against LAE in this action for $204,733, which has not been paid despite demand being made. (Dkt. No. 64-20, ¶ 33). This amount includes a $32,823.81 balance owed on account #101788, payment of which Palker agreed to personally guarantee. (Dkt. No. 67-3, ¶ 39; Dkt. No. 64-18, at 53–54). The record shows that, as of December 8, 2017, outstanding trade creditor claims against LAE amounted to $588,557.90. (*See* Dkt. No. 64-7, at 134–35).

## III.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Upon cross-motions for summary judgment, the Court must "in each case constru[e] the evidence in the light most favorable to the non-moving party." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621–22 (2d Cir. 2008); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

## IV.     DISCUSSION

### A.     Liability for #101788 Account Balance

Plaintiff seeks summary judgment on its claim for breach of contract against Defendant NEF (third cause of action), its claim to recover on a personal guaranty against Defendant Palker (fourth cause of action), and its claim for account stated against Defendants NEF and Palker (fifth cause of action) in connection with the $32,823.81 due on account #101788 for fuel that

Plaintiff provided to LAE from January to May 2016.[18] (Dkt. No. 64; Dkt. No. 64-19, at 14). Defendants NEF and Palker, who have cross-moved for summary judgment, do not dispute that Palker personally guaranteed payment on that account and do not contest that "over $32,000.00 remains outstanding on this account." (Dkt. No. 73, at 7 & n.2). They do not respond, however, to Plaintiff's argument that NEF "is legally responsible for this $32,823.81 bill as well." (Dkt. No. 64-19, at 14).

### 1.    Personal Guaranty Claim (Fourth Cause of Action)

"To obtain summary judgment to enforce a written guaranty, 'all that the creditor need prove is an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty.'" *136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*, 644 F. App'x 10, 11 (2d Cir. 2016) (quoting *City of New York v. Clarose Cinema Corp.*, 256 A.D.2d 69, 71 (1st Dep't 1998)); *accord Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 492 (2015). "As a general rule, a guaranty of payment of a note is an absolute undertaking that the borrower will pay the note when due, and that, if the borrower fails to do so, the guarantor will pay, becoming immediately liable on the default of the principal." *Kirzner v. Plasticware, LLC*, No. 503226/2014, 2015 WL 1723411, at *9–10 (N.Y. Sup. Ct. Apr. 15, 2015), judgment entered, (N.Y. Sup. Ct. 2015).

The guaranty at issue here consists of a single sentence, which is located at the bottom of LAE's application for credit with Long Oil, immediately above Palker's signature. (*See* Dkt. No. 64-7, at 137 ("In signing this document, I personally guarantee payment on the above account.")). The guaranty to pay does not contain any conditional language. *See Citibank, N.A. v.*

---

[18] The Court assumes that New York law governs these claims. Plaintiff's brief relies on New York law, and Defendants do not argue for a different choice of law.

*Uri Schwartz & Sons Diamonds Ltd.*, 97 A.D.3d 444, 446–47 (1st Dep't 2012) (treating as absolute and unconditional a personal guaranty at the end of a loan agreement, which was set off directly above the signature line and where the signing individual "personally agree[d] to the terms of the personal guarantee"). Further, Defendants NEF and Palker do not dispute that Palker signed the guaranty in his individual capacity, and they do not contest the existence of the underlying debt nor the fact that the debt remains outstanding despite demand being made. Accordingly, Plaintiff is entitled to summary judgment on the fourth cause of action against Defendant Palker. *See UBS Commercial Mortg. Tr. 2007-FL1 v. Garrison Special Opportunities Fund L.P.*, No. 652412/2010, 2011 WL 4552404, at *4 (N.Y. Sup. Ct. Mar. 8, 2011).

### 2.    Breach-of-Contract Claim (Third Cause of Action)

Plaintiff, on the other hand, has failed to establish that Defendant NEF is liable for breach of contract as a matter of law. Under New York law, the elements of a claim for breach of contract are: (1) an agreement between the plaintiff and the defendant; (2) adequate performance by the plaintiff; (3) breach by the defendant; and (4) damages suffered as a result of the breach. *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). While Plaintiff asserts that Palker, as president of NEF, made promises to Long Oil about pledging NEF's credit for the payment of fuel oil supplied to LAE, (*see* Dkt. No. 64-19, at 14), Defendants dispute that Palker was acting in his capacity as NEF president during the transition period from January to May 2016. According to Palker's account, he was merely "assisting Bill Spencer, as his friend, from time to time." (Dkt. No. 64-16, at 54). Therefore, there are triable issues of fact about whether NEF agreed to pay for fuel that Long Oil supplied to LAE from January to May 2016. Summary judgment on the third cause of action is accordingly denied.

### 3. Accounts-Stated Claim (Fifth Cause of Action)

A claim for account stated has the following elements: (1) an account was presented; (2) the account was accepted as correct; and (3) the debtor promised to pay the amount stated." *Consol. Energy Design Inc. v. Princeton Club of N.Y.*, 590 F. App'x 115, 116 (2d Cir. 2015). An accounts-stated claim "requires an agreement between the parties to an account based upon prior transactions between them." *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999) (internal quotation marks omitted). "Such an agreement may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment." *Id.* (internal quotation marks omitted). "Whether a bill has been held without objection for a period of time sufficient to give rise to an inference of assent, in light of all the circumstances presented, is ordinarily a question of fact, and becomes a question of law only in those cases where only one inference is rationally possible." *Schwing Elec. Supply Corp. v. Infinity Power Elec. Contracting Inc.*, No. 10-42353, 2013 WL 3227786, 2013 N.Y. Misc. LEXIS 2632, at *10 (N.Y. Sup. Ct. June 18, 2013).

Defendant Palker testified that he asked LAE's vendors to send their bills to Anagnost's office in Manchester, New Hampshire, and that the bills would then be forwarded to LAE's comptroller, Melissa Adams. (Dkt. No. 64-17, at 8–12). The record further shows that a statement of account #101788 was presented to "Land Air Express c/o Anagnost Investments." (Dkt. No. 64-7, at 138–40). This evidence, however, does not incontrovertibly establish that the statement was delivered to Defendant NEF and Defendant Palker, that they accepted it as correct, and that they promised to pay the amount stated. At his deposition, Palker was not aware that LAE had conceded the balance due on account #101788, did not "know if it's inaccurate," and did not "know who did the reconciliation for this." (Dkt. No. 64-18, at 53). Asked whether he was "prepared" to pay the money to Plaintiff, he responded in the negative. (*Id.* at 54). This

testimony indicates that the facts necessary to establish the elements of the accounts-stated claim are disputed. Summary judgment on the fifth cause of action is therefore denied.

## B. Improper Dissolution Claim (Sixth Cause of Action)

In the Complaint, Plaintiff asserts as its sixth cause of action a claim against the Spencer Defendants "for the economic value they received from [NEF] in connection with the sale of assets of Land Air Express due to improper dissolution." (Dkt. No. No. 2, at 17). Plaintiff seeks summary judgment on this claim, (Dkt. No. 64), arguing that LAE has been "informally" dissolved because it "has transferred all of its assets to [NEF], it no longer conducts business, and it is no longer paying its existing debts," (Dkt. No. 64-19, at 15).[19] Further, Plaintiff asserts that directors of LAE owed a fiduciary duty to its creditors concerning "the manner in which the entity ceased business operation." (*Id.*).[20] The Spencer Defendants counter that: first, LAE has not been dissolved; second, even if it had, payment of creditor claims followed the statutory order of priority, so LAE's directors cannot be personally liable; third, "the creditors did receive notice of the transactions between LAE and NEF"; and fourth, there is no evidence that the Spencers "received any economic value from the sale of assets." (Dkt. No. 75-1, at 12–14).

---

[19] In its moving brief, Plaintiff advances improper-dissolution arguments under both New York and Vermont law. (Dkt. No. 64-19, at 15–16). The Spencer Defendants note in their opposition that Vermont, not New York, law "governs the creation and dissolution of a Vermont corporation." (Dkt. No. 75-1, at 12). Plaintiff's reply cites only Vermont law. (*See* Dkt. No. 78, at 4–6). A corporation's "existence as a corporation is referable to the laws of the state of its creation," and a state that "grants the corporation its franchise has exclusive and supreme power to . . . dissolve the corporation." 17A Fletcher Cyclopedia of the Law of Corporations § 8579, Westlaw (database updated Sept. 2018) [hereinafter Fletcher Cyc. Corp.]; *accord Raharney Capital, LLC v. Capital Stack LLC*, 138 A.D.3d 83, 86–87 (1st Dep't 2016) ("We agree with the near-universal view that the courts of one state do not have the power to dissolve a business entity formed under another state's law."). Plaintiff's claim is thus governed by Vermont law.

[20] The parties appear to treat breach of fiduciary duty as the theory of recovery underlying the improper-dissolution claim. But even if breach of fiduciary duty were a separate claim, Vermont law would still control. This Court applies the choice-of-law rules of the state in which it sits, and under New York choice-of-law principles, claims for breach of fiduciary duty are governed by the place of incorporation. *See Walton v. Morgan Stanley & Co.*, 623 F.2d 796, at 798 n.3 (2d Cir. 1980) (citing *Diamond v. Oreamuno*, 24 N.Y.2d 494, 503–04 (1969)).

To begin with, the Court notes that, for its improper-dissolution claim, Plaintiff relies on the right of creditors of an insolvent company to sue directors and officers for mismanagement, as recognized in *Gladstone v. Stuart Cinemas, Inc.*, 2005 VT 44, ¶ 27, 178 Vt. 104, 878 A.2d 214 (2005).[21] Directors and officers owe a fiduciary duty to creditors "not only when the corporation is technically insolvent, but also when the corporation operates in the vicinity or zone of insolvency," such as when the corporation is "unable to pay its debts to plaintiffs." *Id.* ¶ 28. Fiduciary duties of corporate directors and officers include the duties to act (1) "[i]n good faith," (2) "[w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances," and (3) [i]n a manner the director reasonably believes to be in the best interests of the corporation." Vt. Stat. Ann. tit. 11A, § 8.30(a) (2018). "As part of the fiduciary duty owed to the corporation, a director may not profit at the expense or against the interest of the corporation." *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 10, 188 Vt. 245, 6 A.3d 701 (2010). "The duties of good faith and loyalty require that a director must not allow personal interests to interfere with or supersede the interests of the corporation." *Id.*

To prevail on summary judgment, Plaintiff must establish as a matter of law not only that the Spencers owed a fiduciary duty to Plaintiff because LAE was or became insolvent as a result of the May 2016 asset sale, but also that they breached their fiduciary duties of care, good faith, or loyalty to Plaintiff. Generally, any alleged breach of a fiduciary duty by a director or officer is a question for the trier of fact. 3 Fletcher Cyc. Corp. § 837.50; *see also id.* § 1030. And here, the parties dispute the factual predicates of the alleged breach. Plaintiff asserts that the Spencers

---

[21] Because LAE was not actually dissolved and Plaintiff does not rest its improper-dissolution claim on statutory grounds, the Court need not consider whether statutory dissolution procedures were followed, *see* Vt. Stat. Ann. tit. 11A, § 14.08(b), or whether creditors have statutory remedies when a business sells all or substantially all its assets, *see id.* § 12.02. The Court has considered the Spencer Defendants' disjointed arguments about subject-matter jurisdiction, (*see* Dkt. No. 75-1, at 16–19), and finds them without merit.

acted in their own personal interest to maintain their managing roles in the business (albeit as consultants) and reduce their exposure on their personal guaranties to secured creditors. (*See* Dkt. No. 64-7, at 63, 69–74 (asset purchase agreement and consulting agreements providing that the Spencers would be retained as consultants and compensated at $218,400 per year); Dkt. No. 64-9, at 33–34 (Anagnost acknowledging that payment on the secured debts assumed by NEF would reduce the Spencers' exposure under the personal guaranties); Dkt. No. 64-18, at 47–48 (Palker testifying that the secured debt balances were being reduced at a pace of about $200,000 per month)). The Spencer Defendants, on the other hand, claim that they entered into the asset sale transaction to save William's "life's work" and prevent the "unemployment of all the people" who had worked for them. (Dkt. No. 64-10, at 25–26). Thus, even assuming that the May 2016 asset sale rendered LAE insolvent, there are triable issues of fact whether the Spencers breached any fiduciary duty owed to Plaintiff. Summary judgment on the improper-dissolution claim must accordingly be denied.

### C.    Fraudulent Conveyance Claim (Seventh Cause of Action)

Plaintiff asserts as its seventh cause of action a claim for fraudulent conveyance against all remaining Defendants. (Dkt. No. 2, at 17). Plaintiff moves, and Defendants NEF and Palker cross-move, for summary judgment on that claim. (Dkt. Nos. 64, 67). Plaintiff and Defendants NEF and Palker have proceeded on the assumption that New York law applies, (*see* Dkt. No. 64-19, at 17–21; Dkt. No. 73, at 14–19), while the Spencer Defendants conclusorily assert that Vermont law controls instead, (*see* Dkt. No. 75-1, at 15). This Court sitting in diversity applies New York's choice-of-law rules. *Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014). Fraudulent conveyance is a conduct-regulating tort. *Atsco Ltd. v. Swanson*, 29 A.D.3d 465, 466 (1st Dep't 2006). For such torts, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."

*Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993). Under New York law, the "locus of a tort is generally defined as the place of the injury." *Devore v. Pfizer Inc.*, 58 A.D.3d 138, 141 (1st Dep't 2008). Here, the alleged fraudulent conveyance rendered LAE unable to pay trade debts arising from the sale of fuel by Plaintiff, a party based in New York, to a LAE facility in New York. Therefore, as Plaintiff allegedly suffered an injury in New York, the law of New York controls.

The New York Debtor and Creditor Law ("DCL") distinguishes between conveyances that are actually fraudulent, *see* N.Y. Debt. & Cred. Law § 276, and those that are constructively fraudulent, *see id.* §§ 273–275. Whereas actual fraud under DCL § 276 focuses on the transferor's actual intent, constructive fraud under DCL §§ 273–275 is premised on a lack of fair consideration. *See United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994). When a conveyance is determined to be fraudulent as to a creditor, the creditor may, "as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase," have the conveyance "set aside . . . to the extent necessary to satisfy [the creditor's] claim." *Id.* § 278(1)(a).

### 1. Actual Fraud

#### a. Legal Standard

DCL § 276 defines as actually fraudulent "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." The party seeking to set aside the conveyance must prove actual intent by clear and convincing evidence. *McCombs*, 30 F.3d at 328. The "issue of intent is normally a question of fact under New York law." *Id.*

Because direct proof of actual intent is rare, a plaintiff may "rely on so-called 'badges of fraud' to prove his case," which "are circumstances so commonly associated with fraudulent

transfers that their presence gives rise to an inference of intent." *Ray v. Ray*, 108 A.D.3d 449, 451 (1st Dep't 2013). Courts have recognized the following nonexclusive list of badges of fraud: (1) a close relationship between the parties to the transfer; (2) inadequacy of the consideration; (3) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (4) the transferor's retention of control of the property after the transfer; (5) the fact that the transferred property was the only asset sufficient to pay the transferor's obligations; (6) the fact that the same attorney represented the transferee and transferor; and (7) a pattern or course of conduct by the transferor after it incurred its obligation to the creditor. *A&M Glob. Mgmt. Corp. v. Northtown Urology Assocs., P.C.*, 115 A.D.3d 1283, 1288 (4th Dep't 2014); *see also Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999) (including as a badge of fraud "a questionable transfer not in the usual course of business").

### b.   Application

In its opposition to Defendants NEF and Palker's motion, Plaintiff cites record evidence for some of the badges of fraud. (*See* Dkt. No. 70, at 10–11). According to Palker's and Anagnost's deposition testimony, LAE President William was a friend of NEF President Palker, which indicates a close relationship between the parties to the conveyance. (Dkt. No. 64-16, at 54–56; *see also* Dkt. No. 64-14, at 35–36). Additionally, there is evidence that, before the asset sale, William and some of LAE's employees knew that LAE's cash flow would not suffice to pay vendors. (*See* Dkt. No. 64-7, at 20–21; *see* Dkt. No. 64-9, at 17–18). Deposition testimony and the terms of the asset purchase agreement also tend to show that the asset sale deprived LAE of any significant assets to run a business or pay its trade debts. (*See* Dkt. No. 64-7, at 56; Dkt. No. 64-10, at 27; Dkt. No. 64-15, at 30; Dkt. No. 64-18, at 22–24). The evidence further suggests that Palker, purportedly as a representative of LAE, made representations to vendors (including Long Oil) mentioning an investment by NEF in LAE and encouraging them to extend credit

during the transition period before the asset sale, even though Palker apparently knew that NEF had not made an equity investment in LAE. (*See* Dkt. No. 64-1, ¶¶ 11–13; Dkt. No. 64-7, at 7, 22, 33, 43; Dkt. No. 64-17, at 28–30, 55–58). Notably, Long asserts that he was told about the asset sale only after it was complete, when he pressed Palker for payment on the outstanding accounts. (Dkt. No. 64-1, ¶ 18). Defendants NEF and Palker, on the other hand, have mustered contrary evidence that the asset sale was a legitimate business transaction that enabled LAE's underlying business to survive and save jobs. (*See, e.g.*, Dkt. No. 64-10, at 25–26). Given these issues of material fact about Defendants' alleged intent to defraud Plaintiff, both summary judgment motions are denied as to the DCL § 276 claim.

### 2. Constructive Fraud

#### a. Legal Standard

Plaintiff invokes DCL §§ 273 and 275 for his constructive fraud claim. (*See* Dkt. No. 64-19, at 21). Under DCL § 273, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Under DCL § 275, "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." According to the statutory definition, a "person is insolvent when the present fair salable value of [its] assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. Debt. & Cred. Law § 271(1). "The burden of proving both insolvency and the lack of fair consideration is upon the party challenging the conveyance, and the determination of insolvency or what constitutes fair consideration is generally one of fact to be determined under

28

the circumstances of the particular case."[22] *Am. Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 191 A.D.2d 690, 692 (2d Dep't 1993); *accord Murin v. Estate of Schwalen*, 31 A.D.3d 1031, 1032 (3d Dep't 2006). Similarly, a party challenging the conveyance has the burden to prove that the transferor intended or believed that it would incur debts beyond its ability to pay them as they matured. *See Geltzer v. Borriello* (*In re Borriello*), 329 B.R. 367, 373 (Bankr. E.D.N.Y. 2005).

A recipient of property gives fair consideration for the property if: (1) the recipient either conveys property or satisfies an antecedent debt in exchange for the property received; (2) the property conveyed or the antecedent debt satisfied is "a fair equivalent" for the property received, and (3) the exchange is "in good faith." N.Y. Debt. & Cred. Law § 272; *see also Sharp Int'l Corp. v. State St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 53 (2d Cir. 2005). "To show fair equivalent value, neither mathematical precision nor a penny-for-penny exchange is required." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 448 (S.D.N.Y. 2014) (internal quotation marks omitted). A court assessing fair equivalent value must "compare the rough values of what was given and what was received in exchange." *Id.* at 448–49.

New York courts have stressed that the "good faith of both transferor and transferee is . . . an indispensable condition in the definition of fair consideration" under DCL § 272. *Stout St. Fund I, L.P. v. Halifax Grp., LLC*, 148 A.D.3d 744, 748 (2d Dep't 2017) (quoting *Julien J. Studley, Inc. v. Lefrak*, 66 A.D.2d 208, 213 (2d Dep't), *aff'd*, 48 N.Y.2d 954 (1979)) (reversing dismissal of a claim for constructive fraudulent conveyance, where a creditor alleged that a mortgagor did not transfer mortgages to a third party in good faith because the mortgagor "was a

---

[22] As noted by the Second Circuit, however, the burden of production may shift in certain cases. *See McCombs*, 30 F.3d at 324 (noting that there is "some authority under New York law . . . for the view that where the evidentiary facts *as to the nature and value of the consideration* are within the transferee's control, the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee" (internal quotation marks omitted)); *see also id.* at 325 ("New York law creates a presumption of fraud in fraudulent conveyance cases . . . where the conveyance was made *without* evidence of *any* tangible consideration.").

participant in the mortgage fraud scheme of which [the creditor] was a victim"); *accord Sardis v. Frankel*, 113 A.D.3d 135, 142 (1st Dep't 2014); *Mega Pers. Lines, Inc. v. Halton*, 9 A.D.3d 553, 555 (3d Dep't 2004). In *Southern Industries, Inc. v. Jeremias*, the court recognized that the lack of good faith could be shown by: (1) the lack of "an honest belief in the propriety of the activities in question"; (2) "intent to take unconscionable advantage of others"; and (3) "intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." 66 A.D.2d 178, 183 (2d Dep't 1978).

Despite the above general guidelines, good faith can be "an elusive concept in New York's constructive fraud statute." *Sharp*, 403 F.3d at 54 (noting that "[i]t is hard to locate that concept in a statute in which the issue of intent is irrelevant" (internal quotation marks omitted)). The Second Circuit, however, has provided additional guideposts for special situations, like the one here, involving preferred-creditor transferees. A crucial principle in these situations is that "a mere preference between creditors does not constitute bad faith" because, while fraudulent conveyance law aims to ensure that "the debtor uses his limited assets to satisfy *some* of his creditors," "it normally does not try to choose among them." *Id.* at 54 (internal quotation marks omitted). Accordingly, an exchange can be in good faith even if it constitutes a preferential repayment of preexisting debts to a transferee-creditor; the transferee knows that the transferor is preferring him over other creditors; and the preferred transferee knows that the transferor was insolvent. *Id.* (citing *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90–91 (1st Dep't 1993)). The *Sharp* court identified one exception to this transferee-creditor principle—when "the transferee is an officer, director, or major shareholder of the transferor," i.e., an insider. *Id.* (quoting *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987) (distinguishing a New York case finding bad faith where a transferor paid an antecedent

debt to an outsider, noting that the transferor there 'affirmatively swore that the transaction was intended to evade his creditors'" (quoting *Ede v. Ede*, 193 A.D.2d 940, 942 (3d Dep't 1993))).

Additionally, in *HBE Leasing Corp. v. Frank* (*HBE Leasing I*), the Second Circuit explained that, where "a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of 'good faith' is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme." 48 F.3d 623, 636 (2d Cir. 1995). As the court elaborated in *Sharp*, what matters is the transferee's knowledge of fraudulent conduct tainting the conveyance itself—not "the transferee's knowledge of the source of the debtor's monies." 403 F.3d at 55–56 (remarking that "New York fraudulent conveyance law . . . is primarily concerned with transactions that shield company assets from creditors, not the manner in which specific debts were created"); *accord* 30 N.Y. Jur. 2d Creditors' Rights § 389 ("A creditor of an insolvent debtor must stop at securing his or her debt, and if the creditor has knowledge of the debtor's fraudulent purpose in making the preference, such preference will be avoided in favor of other creditors.").

### b.  Application

### i.  Insolvency/Inability to Pay Debts

The Court turns first to the issue of LAE's insolvency and inability to pay debts as they matured. Defendants NEF and Palker point out that Plaintiff has not disclosed an expert to testify whether the May 2016 asset sale rendered LAE insolvent, and they maintain that Plaintiff cannot carry its burden of proof at trial without an expert. (Dkt. No. 64-17, at 20–22; Dkt. No. 73, at 17 n.7). That contention is not persuasive in the circumstances of this case. Neither authority cited by Defendants holds that expert testimony is always required on the issue of insolvency; further, those cases did not involve a situation, like the present one, where a debtor conveyed all or substantially all its assets to another entity. *See Lawson v. Ford Motor Co. (In re Roblin Indus.,*

*Inc.*), 78 F.3d 30, 38 (2d Cir. 1996) (stating, in a case involving the valuation of a business at the time of a preferential transfer, that a determination of insolvency under the Bankruptcy Code should be based on expert testimony "whenever possible"); *Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*, No. 98-cv-3251, 2000 WL 178278, at *11, 2000 U.S. Dist. LEXIS 1481, at *30 (S.D.N.Y. Feb. 16, 2000) (determining that a debtor was not insolvent under the terms of an agreement between creditors, made under Illinois law, to finance the debtor's inventory purchases).

From the asset purchase agreement and the deposition testimony, there is evidence suggesting that the asset sale deprived LAE of any valuable personal property and left it only with worthless assets. (*See* Dkt. No. 64-7, at 56; Dkt. No. 64-10, at 27 (William testifying that, under the asset purchase agreement, he would "lose all the assets for the value of the debt"); Dkt. No. 64-15, at 30 (Anagnost testifying that, "on the face of it," the asset sale would leave LAE without sufficient assets to run a transportation business); Dkt. No. 64-18, at 22–24 (Palker testifying that the transaction would effectively leave LAE with no assets and no money)). Further, it would not be beyond the ken of a jury to find that LAE's "tax returns, tax records, rights to tax refunds" and "insurance policies," (Dkt. No. 64-7, at 56), would not be sufficient or available to cover its trade debt obligations, (*see* Dkt. No. 64-7, at 134–35 (showing a balance of nearly $600,000 in trade creditor claims as of December 2017)). Given the record evidence that LAE conveyed its real property interests to entities controlled by Anagnost several weeks before the asset sale, (*see* Dkt. No. 64-15, at 19–20), a reasonable jury could conclude that, when the dust settled at the end of May 2016, LAE had no substantial assets sufficient to pay past and current debts owing to vendors. On the other hand, Plaintiff has not submitted valuation evidence allowing this Court to find as a matter of law that the fair market value of LAE's assets was less

than its probable debt liability, nor is there uncontroverted evidence that LAE knew that it would be unable to pay its debts as they matured. *See Kenyon & Kenyon LLP v. SightSound Techs., LLC*, 151 A.D.3d 530, 531 (1st Dep't 2017) (affirming denial of a plaintiff's motion for summary judgment on its fraudulent conveyance claim where the plaintiff failed to establish the fair market value of the debtor's assets). Accordingly, there are disputed issues of material fact regarding LAE's insolvency and inability to pay its debts.

### ii. Fair Consideration

Defendants NEF and Palker contend that the transaction was not constructively fraudulent because the consideration for the sale of the LAE's personal assets was the assumption of the secured debt listed in the schedule of encumbrances, and the release of an antecedent debt is fair consideration. (*See* Dkt. No. 67-17, at 18–20; Dkt. No. 73, at 16–19). An "assumption of and agreement to pay" an antecedent debt generally constitutes fair consideration for property conveyed.[23] *McCombs*, 30 F.3d at 325. This general principle has a notable exception—when the conveyance is to an insider, such as "an officer, director, or major shareholder of the transferor." *Atlanta Shipping*, 818 F.2d at 249. Furthermore, even when a transaction involves the exchange of fair equivalents,[24] it will be deemed to lack good faith if it benefits an insider. *See Sharp*, 403 F.3d at 54; Ede, 193 A.D.2d at 941–42.

---

[23] Plaintiff argues that there is no proof that the assumed debt has been released, (*see* Dkt. No. 70, at 12), but Plaintiff makes no effort to square that argument with case law holding that an assumption and agreement to pay are generally sufficient consideration.

[24] The Court notes that the record is silent on the amount of secured debt assumed. *See Allstate Ins. Co. v. Mirvis*, No. 08-cv-4405, 2017 WL 4287778, at *5 (E.D.N.Y. July 31, 2017) ("Where 'no evidence has been presented . . . to indicate the amount of the debt, the amount by which the alleged debt was reduced, or even how such debt may have been incurred in the first place . . . a conveyance will be found void.'" (quoting *Petersen v. Vallenzano*, 849 F. Supp. 228, 232 (S.D.N.Y. 1994))), *report and recommendation adopted*, 2017 WL 3981297 (E.D.N.Y. Sept. 8, 2017). As discussed below, factual disputes about the insider status of Palker and NEF preclude summary judgment for either side. Accordingly, the Court need not decide whether the transaction—whether viewed in isolation or in the context of the quasi-contemporaneous real property transfers—involved the exchange of fair equivalents, nor need the Court consider whether the real property transfers can be considered as part of this lawsuit.

Defendants argue that "Land Air and NEF's shareholders and directors did not overlap before, during, or after they entered into the APA." (Dkt. No. 73, at 18). Plaintiff, however, has raised a triable issue of fact concerning the insider status of Defendants NEF and Palker. Given Palker's management role at LAE in the period preceding the asset sale, (*see, e.g.*, Dkt. No. 64-7, at 14–18 (emails in which Palker instructs LAE employees on paying certain vendor accounts, ordering parts, and paying employee pension and health insurance contributions)), a reasonable juror could find that Palker was an insider at LAE. *Chen*, 8 F. Supp. 3d at 425, 439 (finding a "triable dispute" as to the insider status of an individual who performer administrative, financial, and human resources duties at the transferor company). Because Palker held a controlling share in NEF, (Dkt. No. 64-13, at 20; Dkt. No. 64-16, at 15), a finding that Palker was an insider of LAE would mean that NEF was an insider as well, *see Mega Personal Lines*, 9 A.D.3d at 555 ("When the insider is the transferee or controls the transferee, there can be no factual dispute that the purpose of the transfer was to confer on the insider a preference over other creditors."). Moreover, a reasonable juror could find that, after the January 2016 stock purchase agreement, NEF effectively controlled LAE, even if the agreement was never "consummated." *Cf. DeRosa v. Buildex Inc.* (*In re F&S Cent. Mfg. Corp.*), 53 B.R. 842, 848 (Bankr. E.D.N.Y. 1985) (finding, for purposes of determining insider status under the Bankruptcy Code, that, under the terms of the stock purchase agreement, the defendant had the requisite control over the debtor to be an insider). These factual disputes preclude a finding that NEF's assumption of LAE's secured debt constituted fair consideration as a matter of law.[25]

---

[25] The Court likewise rejects the Spencer Defendants' Rule 9(b) argument, (Dkt. No. 75-1, at 14), as inapposite at this stage of the case, when arguments have to be tailored to the evidence in the record. *See Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 n.4 (2d Cir. 2001) (finding that a Rule 9(b) motion need not be considered at the summary judgment stage after the close of discovery, by which time the defendant "had all of the particulars"); *Fleck v. Gen. Motors LLC* (*In re Gen. Motors LLC Ignition Switch Litig.*), 154 F. Supp. 3d 30, 41 (S.D.N.Y. 2015) (noting that the

#### D. Successor Liability

In its motion for summary judgment, Plaintiff argues that the circumstances surrounding the asset sale warrant imposing successor liability. (*See* Dkt. No. 64-19, at 22–24). As an initial matter, the Court notes that successor liability does not constitute an independent cause of action but is merely a theory of recovery on an underlying liability. *See City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274, 290 (N.D.N.Y. 2012) (explaining that "'successor liability' is not a separate cause of action but merely a theory for imposing liability on a defendant based on the predecessor's conduct"); *see also In re Motors Liquidation Co.*, 590 B.R. 39, 63 (S.D.N.Y. 2018) ("By definition, successor liability claims derive from the liability of the predecessor entity."); *Payamps v. M & M Convenience Deli & Grocery Corp.*, No. 16-cv-4895, 2018 WL 3742696, at *10 (E.D.N.Y. May 18, 2018) ("Of course, a seller must have liability in the first place for the Court to analyze whether [successor liability] exceptions would apply."). Thus, in this case, the question is whether NEF, as the successor entity, can be liable for LAE's contractual obligation to pay Plaintiff for debts due and owing. Plaintiff and Defendant NEF both agree that New York law applies, (Dkt. No. 64-19, at 12; Dkt. No. 67-17, at 11), and the Court will assume likewise, *see Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001).

"Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006). Successor liability, however, applies in four situations: "(1) [the buyer] expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation

---

defendant's "reliance on Rule 9(b)—which establishes a heightened *pleading* standard for fraud—is misplaced at the summary judgment stage").

was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Id.* (quoting *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244–45 (1983)). The second exception subsumes the doctrine of de facto merger, "when a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser." *Id.* (internal quotation marks omitted). The "hallmarks" of common-law de factor merger are: "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *Id.* New York courts follow the four-part common-law test, and the Second Circuit has held that continuity of ownership is a required element under New York law. *Id.* at 210.

The parties dispute whether continuity of ownership is present in this case. As discussed above, the stock purchase agreement raises factual questions about NEF's status as a shareholder of LAE prior to the asset sale. Based on this record, the Court cannot rule as a matter of law that Plaintiff established continuity of ownership. Conversely, summary judgment cannot be entered in favor of Defendant NEF, as Plaintiff has raised triable issues of fact about fraudulent conveyance, thus triggering the fourth exception to the no-successor-liability rule.

### E.     Unjust Enrichment Claim (Eighth Cause of Action)

Plaintiff asserts as its eighth and last cause of action a claim for unjust enrichment against Defendants NEF and Palker. (Dkt. No. 2, at 15–17).[26] Both sides assume that New York law

---

[26] The Complaint labels the claim as one "for constructive trust/unjust enrichment," (Dkt. No. 2, at 17), which seems to suggest a claim for unjust enrichment seeking the remedy of constructive trust. *See Rosen v. Chowaiki & Co. Fine Art Ltd.* (*In re Chowaiki & Co. Fine Art Ltd.*), 593 B.R. 699, 719 (Bankr. S.D.N.Y. 2018) ("A constructive trust is a remedy, not a cause of action. The proper pleading would be a claim for unjust enrichment, with the requested relief

applies, a premise the Court again adopts. (*See supra* Part IV.D). In its motion, Plaintiff

describes the underlying allegations as follows:

> [B]y [NEF] arranging with Long Oil to have continual credit advanced for the benefit of Land Air and fuel oil continually provided to Land Air during the period January through May 2016, [NEF] received the benefit of having Land Air continue to be an ongoing entity with goodwill. Therefore, when Land Air transferred intangible assets to [NEF] for no consideration, and [NEF], and its owner Phillip Palker, were able to operate an ongoing business because of the maintenance of goodwill[,] [NEF] was unjustly enriched when the fuel oil bill due to Long Oil was not paid.

(Dkt. No. 64-19, at 25). Defendants NEF and Palker respond that the unjust enrichment claim

fails because plaintiff cannot prove successor liability. (*See* Dkt. No. 73, at 20). Whatever the

merit of that defense, it is unavailing since successor liability cannot be decided on the present

record. (*See supra* Part IV.D).

For this claim, Plaintiff cites *Farash v. Sykes Datatronics, Inc.*, which is based on

reliance, a quasi-contract theory. 59 N.Y.2d 500, 505 (1983) (holding that a promisee "who has

not conferred a benefit may not obtain restitution" but may nevertheless recover if it performed

in reliance on a defendant's promise and suffered a detriment as a result). Indeed, Plaintiff

equates its claim with the quasi-contract remedy of quantum meruit. (*See* Dkt. No. 64-19, at 25).

The Court may thus analyze this claim "as a single quasi contract claim." *Mid-Hudson Catskill*

*Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citing cases

explaining that "quantum meruit and unjust enrichment are not separate causes of action," that

---

of a constructive trust."). But as discussed below, Plaintiff actually seems to advance a quasi-contract claim seeking quantum meruit. Further, the Court notes that Plaintiff has not identified any specific property on which a constructive trust could be imposed. *See Fed. Ins. Co. v. United States*, 882 F.3d 348, 373 (2d Cir. 2018) (stating that "a constructive trust attaches only to the specific property appropriated from a claimant by the offender or that can be traceable thereto"); Restatement (Third) of Restitution and Unjust Enrichment § 31 cmt. c (Am. Law Inst. 2011) ("If a defendant is unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the claimant's rights, the defendant may be declared a constructive trustee, for the benefit of the claimant, of the property in question and its traceable product.").

"unjust enrichment is a required element for an implied-in-law, or quasi contract, [claim]," and that "quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract").

To recover on a quasi-contract claim, a plaintiff must show: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.* (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir.2000)). There is no question that LAE accepted Plaintiff's services and stipulated to judgment on the breach-of-contract claim against it.[27] But Palker disputes that it acted on behalf of NEF and testified that he was only "assisting Bill Spencer, as his friend, from time to time." (Dkt. No. 64-16, at 54). Given this factual dispute, the Court must deny summary judgment on the eighth cause of action.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 64) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 64) as to the fourth cause of action (personal guaranty) against Defendant Phillip J. Palker is **GRANTED**; and it is further

---

[27] Because the parties have not briefed whether the scope of the fuel sale contract's subject matter precludes recovery in quasi-contract, the Court declines to address the issue at this point. *See Melcher v. Apollo Med. Fund Mgmt. L.L.C.*, 105 A.D.3d 15, 27 (1st Dep't 2013) (stating that the "existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter" (quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388 (1987))); *Randall's Island Aquatic Leisure, LLC v. City of New York*, 92 A.D.3d 463, 464 (1st Dep't 2012) (holding that "there can be no quasi-contract claim against a third-party non-signatory to a contract that covers the subject matter of the claim"); *but see RCC Ventures, LLC v. Am. DG Energy, Inc.*, No. 17-cv-3007, 2018 WL 1415219, at *5 (S.D.N.Y. Mar. 19, 2018) (noting that courts define a claim's subject matter "with specificity when deciding if it is governed by a valid contract," and finding that the contract at issue did not "cover the subject matter of these quasi-contract claims" because the contract did not reach the defendant's actions).

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 64) is otherwise

**DENIED**; and it is further

**ORDERED** that Defendants NEF and Palker's motion for summary judgment (Dkt. No.

67) is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated: March 25, 2019
Syracuse, New York

Brenda K. Sannes
U.S. District Judge